**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| CROWN CASTLE FIBER LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2:17-cv-2562-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| CITY OF CHARLESTON, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————————— | ) | |

The following matter is before the court on plaintiff Crown Castle Fiber LLC's

("Crown Castle") motion for summary judgment, ECF No. 67. For the reasons set forth

below, the court grants in part and denies in part the motion.

<h2>I. BACKGROUND</h2>

Crown Castle is a telecommunications services provider that seeks to install and

operate telecommunications facilities in the City of Charleston, South Carolina ("the

City"). In order to provide its services, Crown Castle uses fiber optic lines and

equipment figurations called "Nodes." Nodes consist of various equipment and are

located on utility or streetlight poles. Individual Nodes are also referred to as "small

cells" or "small wireless facilities." To construct its network and facilities, Crown Castle

needs authorization from the City.

The City's standard process for telecommunications facilities in public rights-of-

way is as follows. The entity seeking to install telecommunications facilities must obtain

an engineering permit from the Department of Public Service. Separately, the city's

Design Review Committee ("DRC") reviews and makes recommendations regarding the

aesthetics of the facilities. The DRC's recommendation is required before the

Department of Public Service will issue the engineering permit. The City also requires "franchise agreements," sometimes referred to as "franchises," for entities wishing to use the City's rights-of-way. These requirements apply to all entities, but the rights-of-way at issue here include the use of existing utility poles, building new poles, and laying fiber optic lines.

Crown Castle's endeavor to deploy small cell facilities in the City began in November 2014. Ann Brooks, the Government Relations Manager with Crown Castle at the time, reached out to the City to determine the process and requirements to construct Crown Castle's network in Charleston. Ms. Brooks spoke with Adelaide Andrews, an attorney in the City's Corporation Counsel office, and provided, via email, a copy of Crown Castle's executed franchise agreement with the City of Columbia, South Carolina and a proposed franchise agreement using the Municipal Association of South Carolina ("MASC") model. ECF No. 68-1 at 2. The City did not respond to Ms. Brooks's email. ECF No. 68, Brooks Decl. ¶ 5. Then on December 18, 2014, Ms. Brooks met with City staff to present an application package detailing Crown Castle's proposed facilities and the general locations of the Nodes and fiber optic lines. Id. ¶ 6. After the meeting, Ms. Brooks emailed the MASC model franchise agreement, copies of Crown Castle's franchise agreement with Columbia, South Carolina and Florence, South Carolina, and the contact information for Crown Castle's point of contact with those two cities. ECF No. 68-2 at 2. The City never responded to Ms. Brooks's email. Brooks Decl. ¶ 6.

In February 2015, Ms. Brooks again sent the MASC model franchise agreement to the City and asked for the City's preferred form of franchise but did not get a response. Id. ¶ 7; ECF No. 68-3. Ms. Brooks also introduced Susan Herdina, the Deputy

Corporation Counsel for the City at the time, to Crown Castle's counsel so that they could begin negotiating right-of-way authorization. Brooks Decl. ¶ 8; ECF No. 68-4. Ms. Herdina asked to push off Crown Castle's requested meeting and did not provide comment on the proposed right-of-way agreement. Brooks Decl. ¶ 8.

Ms. Brooks spoke to Ms. Herdina again in March 2015 regarding Crown Castle's proposed deployment. Id. ¶ 9. During that conversation, Ms. Herdina told Ms. Brooks she would provide a document containing the City's preferred terms for an authorizing agreement. Id. Then in a March 29, 2015 letter to Ms. Herdina, Ms. Brooks described Crown Castle's proposed facilities and provided a proposed network map, photographs and photo simulations of representative Crown Castle installations, and other materials. Id.; ECF No. 68-6. The City did not respond to Ms. Brooks's letter nor did it provide its preferred terms for an authorizing agreement. Brooks Decl. ¶ 9.

In April 2015, Ms. Herdina asked for a more detailed description of where Crown Castle intended to install equipment in the City, engineering drawings for the fiber deployment and Node deployment, and right-of-way agreements that Crown Castle had executed with other cities. Id. ¶ 10; ECF No. 68-7. Ms. Herdina also expressed concern regarding an indemnification provision in the proposed agreement that Crown Castle provided. ECF No. 68-7. Ms. Brooks responded, noting that she had sent a map with specific Node locations after their December meeting and explained that Crown Castle had not yet designed the fiber routes. Id. Ms. Brooks stated that Crown Castle "understand[s] the unique disposition of Charleston, and want[s] to work with [the City] to ensure [Crown Castle's] installation runs as smoothly as possible." Id. She then asked Ms. Herdina to send the City's redline comments to the proposed agreement by Friday,

April 24.  Id.  The City did not respond to Ms. Brooks's request.  Brooks Decl. ¶ 10.  On

July 14, 2015, Ms. Brooks and Crown Castle's local counsel met with Ms. Herdina and

another City employee to discuss Crown Castle's proposed network.  Brooks Decl. ¶ 11.

Then on October 21, 2015, at the City's direction, Crown Castle submitted three

applications to the South Carolina Department of Transportation ("SCDOT") for

encroachment permits for fiber optic lines.  ECF No. 69, Free Decl. ¶ 3.  SCDOT

approved the applications on December 30, 2015, conditioned on the City's approval.

Free Decl. ¶ 4.  In December 2015, a Crown Castle attorney attempted to engage with

Ms. Herdina, but Ms. Herdina only apologized for her delay in responding to the email

and promised to call the following week.  ECF No. 63-8.

On April 20, 2016, David Free, an implementation project manager with Crown

Castle, met with Ted Barker, the Supervisor of Roadway Inspection for the City, to

discuss Crown Castle's network, including drawings with proposed sites and locations.

Free Decl. ¶ 6.  Then on May 3, 2016, Crown Castle submitted the approved SCDOT

permits and encroachment agreement application packages requesting consent to install

lines and Nodes in the City's right of way to Mr. Barker.  Brooks Decl. ¶ 14.  During this

time, the City had decided to adopt a small wireless facility ordinance and was in the

process of drafting it ("Small Cell Ordinance").  As such, Mr. Baker stated that he could

not process the applications until the City's new ordinance was implemented.  Id.  Then

on May 4, 2016, Ms. Brooks met with various City staff to discuss Crown Castle's

planned deployment and the City's delay.  Id. ¶ 15.  The City assured Ms. Brooks that a

new ordinance was being drafted to govern the deployment of small cells in the City.  Id.

Crown Castle met again with City staff in August 2016.  Id. ¶ 17.  Crown Castle subsequently provided the City with a draft model ordinance related to small wireless facilities and information regarding the deployment of Crown Castle's services in other cities.  Id. ¶¶ 18–19.  Then on January 28, 2017, Ms. Brooks asked the City to provide the Department of Public Service with any information necessary to review Crown Castle's fiber permits.  Id. ¶ 20, ECF No. 68-11.  Ms. Brooks then met with City staff on February 2, 2017 to discuss Crown Castle's efforts.  Brooks Decl. ¶ 21.  After this meeting, Ms. Brooks provided SCDOT permit materials to the City and, at the City's request, additional sample small cell ordinances from various cities.  Brooks Decl. ¶ 21.  Ms. Brooks met again with City staff on February 14, 2017.  Id. ¶ 22.

On March 6, 2017, Ms. Brooks emailed a City staff member to note that Mr. Free was meeting with Mr. Barker the following day to discuss Crown Castle's fiber permit application submittal and associated documents.  ECF No. 68-15.  Ms. Brooks stated that Crown Castle "looked forward to learning more about bond and insurance requirements, as well as any other required materials."  Id.  City staff responded to Ms. Brooks's email, stating that the City was reviewing the information Crown Castle had sent and expressing hope that they would finish up that week.  Id.  On March 7, 2017, Mr. Free met again with Mr. Barker, but the City was not proceeding with the fiber permit applications at that time.  Free Decl. ¶ 9.  Ms. Brooks requested an update again on March 16, 2017, asking what the City would require in terms of proof of insurance and a bond.  ECF No. 68-15.  She did not hear back about her request.  Brooks Decl. ¶ 23.

On May 17, 2017, Crown Castle wrote to the Mayor of the City requesting assistance.  Id. ¶ 24; ECF No. 68-16.  On July 6, 2017, a Senior Advisor to the Mayor

responded, explaining that "the City of Charleston possess many outdated processes and policies that hinder collaboration between the City and service providers, such as Crown Castle." ECF No. 68-17 at 1. He explained that the City determined that it needed to create a "broadband master plan" and that it would issue a Request for Proposal ("RFP") to engage a consultant to create the plan. Id. The RFP was issued on October 13, 2017 and awarded to a vendor on January 22, 2018.

The City does not dispute the occurrence of these meetings and contacts. Instead, the City explains that the use of Nodes and small cell technology is something new to the City, and that the City has the additional concern of how these services would affect the City's historic district specifically. The City relies primarily on deposition testimony from Ms. Herdina, who explained that when the City was initially contacted by Crown Castle, the City was first interested in learning more about the technology and its impact on the City before entering into a franchise agreement and presenting it to the Mayor and City Council. ECF No. 79-7, Herdina Depo. 27:1–21. Ms. Herdina explained that the City requested detailed plans for the historic areas of the peninsula, and that the City felt like they weren't getting what they were looking for during discussions with Crown Castle. Herdina Depo. 27:22–29:4. According to the City, Crown Castle provided a lot of generalized material and examples from other cities, but the information was not tailored to Charleston's unique historical considerations. Herdina Depo. 44:1–16. Ms. Herdina generally explained that there was a disconnect between Crown Castle and the City, and that Crown Castle wanted to push ahead before the City could understand what exactly it would be getting into. She summarized the issue by stating that "we never felt like Crown Castle had provided us with a proposed agreement or guidelines that were

6

sensitive to the unique historic nature of Charleston." Herdina Depo. 44:12–16. The City also stresses that there was no process in place to do what Crown Castle wanted to do—deploy small cell wireless facilities.

Crown Castle filed this action on September 22, 2017, alleging that the City has refused to process or make an decision on any of Crown Castle's permit applications and requests to establish telecommunications facilities in Charleston in violation of 47 U.S.C. § 253. On June 22, 2018, the parties engaged in mediation and reached a Contingent Memorandum of Understanding ("MOU"). The MOU provided a potential resolution of the case subject to the City enacting a small cell ordinance ("the Small Cell Ordinance"). As such, the parties filed a joint motion to stay the case, which the court granted.

On September 18, 2018, the City passed an ordinance requiring service providers to obtain a franchise agreement before installing and constructing fiber optics within the City's rights-of way. ECF No. 79-2. On September 26, 2018, the FCC issued a declaratory ruling, In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. 9088 (2018), with an effective date of January 14, 2019 ("FCC Declaratory Ruling"). At the time, the City was still working on drafting the Small Cell Ordinance. Crown Castle then took the position that various portions of the City's draft version of the Small Cell Ordinance would be illegal once the FCC Declaratory Ruling took effect. Pursuant to the MOU, on November 27, 2018, the City adopted the Small Cell Ordinance. ECF No. 79-1. Through a letter dated November 27, 2018, Crown Castle notified the City that it believed that the Small Cell Ordinance violates 47 U.S.C. § 253 as interpreted by the FCC. Notably, Crown Castle has not made this allegation in the instant action.

The case was stayed until April 19, 2019 while the parties attempted to settle this case. After being unable to do so, Crown Castle filed an amended complaint on May 23, 2019. ECF No. 62. Crown Castle then filed its motion for summary judgment on June 24, 2019. ECF No. 67. On July 30, 2019, the City entered into a franchise agreement with Crown Castle. ECF No. 79-3. The City then responded to Crown Castle's motion for summary judgment on August 9, 2019, ECF No. 79, and Crown Castle replied on August 26, 2019, ECF No. 82. The court held a hearing on the motion on September 26, 2019. On December 17, 2019, Crown Castle filed a supplemental reply. ECF No. 91. That supplemental reply explained that the Mayor met with City staff on December 6, 2019 to review Crown Castle's remaining applications but that no action was taken.

As of February 19, 2020, the City had still not acted on the applications. On March 18, 2020, Crown Castle filed its second amended complaint to seek relief for the remaining applications at issue: Crown Castle's eleven applications for wireless facilities on existing poles[1] and Crown Castle's five applications for wireless facilities on new poles.[2] The second amended complaint brings claims for a violation of 47 U.S.C. § 253(a) ("Count I"), attorney's fees ("Count II"), failure to act in a timely manner for Nodes on existing poles in violation of 47 U.S.C. § 332(c)(7)(B)(ii) ("Count III"), and failure to act in a timely manner for Nodes on new poles in violation of 47 U.S.C. § 332(c)(7)(B)(ii) ("Count IV").

---

[1] These applications are identified as CHS-001, CHS-002, CHS-006, CHS-009, CHS-016, CHS-019, CHS-022, CHS-023, CHS-027, CHS-028, and CHS-030.
[2] These applications are identified as CHS-010, CHS-018, CHS-026, CHS-029, and CHS-032.

## II.  STANDARD

Summary judgment shall be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Id. at 255.

## III.  DISCUSSION

Crown Castle argues that summary judgment in its favor is warranted because the undisputed facts show that the City has violated 47 U.S.C. § 253(a) by actually and effectively prohibiting Crown Castle from providing telecommunications services, and that the City has failed to act in a timely manner on Crown Castle's 16 applications in violation of 47 U.S.C. § 332(c)(7)(B)(ii).  Crown Castle seeks an injunction requiring the City to accept Crown Castle's applications and permit Crown Castle to install and

maintain fiber optic lines.  The court will first address the City's mootness argument and then considers whether summary judgment in favor of Crown Castle is appropriate.

### A.  Mootness

As an initial matter, the City argues that many of the issues raised by Crown Castle are now moot.  Those issues include: (1) the amount of time it took the City to adopt the Small Cell Ordinance; (2) the City's failure to act in a timely manner regarding Crown Castle's request for a franchise agreement; and (3) the City's failure to timely process Crown Castle's small cell permit applications.  The City explains that it has now adopted the Small Cell Ordinance and granted a franchise agreement to Crown Castle.  The City also explains that, although several of Crown Castle's applications have not yet been approved or rejected, the DRC is still working with Crown Castle on Crown Castle's applications, meaning that some action is being taken.  In response to this argument, Crown Castle contends that its claim regarding its applications are not moot because its applications still have not be granted or denied.

The court finds that any arguments about the amount of time it took the City to enact the Small Cell Ordinance or about the franchise agreement are now moot given that the City has passed the Small Cell Ordinance and entered into a franchise agreement with Crown Castle.  However, Crown Castle's arguments regarding its 16 applications on which the City has yet to act are not moot.  As such, the court will still consider Crown Castle's arguments regarding the 16 applications that are still pending before the City.

### B.  Violation of § 253(a)

Turning to Crown Castle's substantive arguments, Crown Castle first argues that the City has violated § 253(a) because its inaction constitutes a de facto moratorium,

which the FCC Declaratory Ruling found to be violative of § 253(a). Pursuant to 47 U.S.C. § 253(a), "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." "Courts have held that a prohibition does not need to be complete or 'insurmountable' to run afoul of § 253(a)." TCG New York, Inc. v. City of White Plains, 305 F.3d 67, 76 (2d Cir. 2002). "Additionally, the FCC has stated that, in determining whether an ordinance has the effect of prohibiting the provision of telecommunications services, it 'consider[s] whether the ordinance materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment.'" Id. (quoting Cal. Payphone Ass'n, 12 F.C.C.R. 14191, 1997 WL 400726, at ¶ 31 (1997)).

The FCC Declaratory Ruling found that de facto moratoria violate § 253(a). In the Matter of Accelerating Wireline Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. at 7780. It defines de facto moratoria as "state or local actions that are not express moratoria, but that effectively halt or suspend the acceptance, processing, or approval of applications or permits for telecommunications services or facilities in a manner akin to an express moratorium." Id. Several examples provided by the FCC of a de facto moratorium include blanket refusals to process applications, lengthy delays in processing applications, and claims that applications cannot be processed until pending legislation is adopted. Id. at 7780–81. The FCC further states that "[a] de facto moratorium can prohibit or effectively prohibit an entity from providing telecommunications service if the provider cannot obtain approval or authorization to deploy from the state or local government due to inaction or refusal, even if there is no

11

statute, regulation, or other express legal requirement restricting the acceptance, processing, or grant of applications or authorizations." Id. at 7782.

The City's inaction certainly fits within the FCC's definition of a de facto moratorium. However, the court is not convinced that the FCC Declaratory Ruling is binding on the court, meaning the court is uncertain that it can find that a de facto moratorium is a violation of § 253(a). The City notes that there is currently an appeal of the Declaratory Ruling, and it is not clear whether the court must abide by the FCC's declaratory rulings in general, citing PDR Network LLC v. Carlton & Harris Chiropractic, Inc., 139 S. Ct. 2051 (June 20, 2019). In response, Crown Castle clarified that the Tenth Circuit denied a stay of effectiveness of the Declaratory Ruling, meaning that the Declaratory Ruling is currently in force. Moreover, Crown Castle explains that in PDR Networks, the Supreme Court emphasized that it was not reaching the question of whether the district court was bound by the FCC, but that existing precedent does establish that district courts are bound by agency interpretations, citing Mais v. Gulf Coast Collection Bureau Inc., 768 F.3d 1110, 1119 (11th Cir. 2014).

The court agrees that the FCC Declaratory Ruling is currently in force. The Tenth Circuit has denied a motion to stay the FCC Declaratory Ruling pending appeal. City of San Jose v. FCC, 2019 U.S. App. LEXIS 4015, at *6 (10th Cir. Jan. 10, 2019). Therefore, the FCC Declaratory Ruling is still in effect during the pendency of its appeal. However, whether the Declaratory Ruling is still in effect does not necessarily mean that the Declaratory Ruling is binding on the court. In PDR Network, the Supreme Court was confronted with various questions regarding the binding nature of the FCC's declaratory rulings on district courts, none of which the Court "definitively resolve[d]." 139 S.Ct. at

2055. The Supreme Court pondered whether FCC declaratory rulings have the "force and effect of law", making them binding, or whether they are "the equivalent of an interpretive rule" that "lacks the force and effect of law" but didn't answer the question. Id. Because the Court did not answer these questions, the question of whether FCC declaratory rulings are binding on district courts remains unresolved.

Contrary to what Crown Castle argues, Mais does not stand for the proposition that a district court is bound by an FCC declaratory judgment. Instead, the Eleventh Circuit held in that case that the FCC declaratory ruling at issue was an order that was reviewable only in courts of appeals under the Hobbs Act, and that "the district court was without jurisdiction to consider the wisdom and efficacy" of the FCC declaratory ruling. 768 F.3d at 1121. Therefore, Mais established that district courts do not have jurisdiction to consider the validity of an FCC declaratory ruling, not that a district court must give binding weight to declaratory rulings.

Because the Supreme Court has not definitively answered whether FCC declaratory rulings are binding on district courts, the parties have left the court in a bit of a conundrum. To convince the court that the Declaratory Ruling is binding on the district court, Crown Castle must show that the Declaratory Ruling is equivalent to a legislative rule that has the force and effect of law. Crown Castle has not made this argument. Similarly, to convince the court that the Declaratory Ruling is not binding on the district court, the City must show that the Declaratory Ruling is equivalent to an interpretive rule that does not have the force and effect of law. The City has not made this argument either. As such, the court is left with no argument before it as to what weight it should

give the Declaratory Ruling and declines to make such a finding without argument from the parties.

Moreover, Crown Castle provides no examples of courts that have found a § 253(a) violation based on a de facto moratorium. Instead, the case law relied upon by Crown Castle that relates to § 253(a) violations only deals with the question of whether ordinances violated § 253(a), not whether a city's inaction, considered to be a de facto moratorium, violated § 253(a). Crown Castle cites to <u>TCG New York, Inc.</u> for the proposition that "excessive delays" of approval that effectively prohibit a carrier from providing telecommunications services violate § 253(a); however, that is an oversimplification of what the court said. The Second Circuit found that White Plains's ordinance posed obstacles to TCG's ability to compete in White Plains on a fair basis, one of which was "the extensive delays in processing TCG's request for a franchise." 305 F.3d at 76–77. As such, the Second Circuit concluded that the <u>ordinance</u> violated § 253(a). <u>Id.</u> Similarly, in <u>Peco Energy Co. v. Twp. of Haverford</u>, the parties were challenging an ordinance, not the locality's general inaction. 1999 WL 1240941, at *8 (E.D. Pa. Dec. 20, 1999) ("The Ordinance provides absolutely no guidance to a provider about how to apply for a franchise or what the contents of such an application should be.").

Considering the other case cited by Crown Castle, the court in <u>AT&T Commc'ns of the Sw., Inc. v. City of Austin, Tex.</u> did generally recognize that a delayed entry into a telecommunications market can have "profound effects" on the success of a provider. 975 F. Supp. 928, 938 (W.D. Tex. 1997), vacated on other grounds, 235 F.3d 241 (5th Cir. 2000). However, this statement was not in the context of whether the City of Austin

violated § 253(a); it was made in the court's consideration of whether the case was ripe. Therefore, this case does not provide much, if any, support for Crown Castle.  In sum, Crown Castle has not cited to any court that has found a violation of § 253(a) based on a de facto moratorium, and the court's own research has not revealed any such case.

Given the lack of argument on whether the FCC Declaratory Ruling is binding on this court and the apparent lack of cases in which a court has found that a city violated § 253(a) by enacting a de facto moratorium, the court finds that summary judgment is not warranted on the issue of whether the City has violated § 253(a) based on a de facto moratorium.

Moreover, without considering the FCC Declaratory Ruling, the court fails to see how the City's inaction constitutes a violation of § 253(a).  The plain language of § 253(a) reads "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  Crown Castle has made clear that it is not challenging the Small Cell Ordinance and cites to no local regulation at issue.  That leaves challenges to a "local legal requirement," but Crown Castle is not challenging any requirement.  Instead, Crown Castle is challenging the City's inaction and delay.  The court struggles to understand how this challenge fits within the confines of § 253(a) notwithstanding the FCC Declaratory Ruling's de facto moratorium finding.

Crown Castle additionally argues that the City is not complying with the Small Cell Ordinance because the Mayor has become involved in the application review process, which is not provided for in the Small Cell Ordinance, and that the Mayor's discretionary involvement in the application review process violates § 253(a).  Crown

Castle explains that, according to the ordinance, the DRC is the entity with the authority to approve or reject applications, and that there is no mention of the Mayor's involvement. Crown Castle then contends that the Mayor has taken over the decision-making process in violation of the Small Cell Ordinance and is unilaterally making decisions on applications without involvement from the DRC.

The court is unconvinced that the City's alleged failure to comply with the Small Cell Ordinance and the Mayor's alleged discretionary involvement in the application process violates § 253(a). Crown Castle likens the facts here to those in Peco Energy Co. In that case, the court explained that the ordinance at issue created various barriers to entry into the telecommunications market that, in sum, violated § 253(a). 1999 WL 1240941, at *8. One of those barriers was that "under the express terms of the Ordinance, the Township Manager, in his sole discretion, can completely prohibit the provision of telecommunications services, as the Ordinance merely provides that he 'may' approve an application." Id. Crown Castle contends that, like in Peco Energy Co., the Mayor, in his sole discretion, can review and reject applications, and this violates § 253(a). However, the issue in Peco Energy Co. was that the ordinance granted this discretionary authority, and the ordinance was challenged under § 253(a). Here, Crown Castle is not arguing that the Small Cell Ordinance is invalid or that the Small Cell Ordinance improperly grants the Mayor sole discretion over the review process; instead, Crown Castle is arguing that the City and the Mayor are operating outside of the confines of the Small Cell Ordinance.[3] In other words, Crown Castle is challenging the City's

---

[3] Moreover, the court is not entirely convinced that the Mayor's involvement is improper. At the hearing on the motion, counsel for the City explained that the DRC was designed for the sole purpose of making recommendations to the Mayor about whether or

inaction and the Mayor's actions, not a "State or local statute or regulation, or other State or local legal requirement." As discussed above, the court fails to see how this challenge fits within the plain language of the statute.

In sum, the court declines to consider whether the FCC Declaratory Ruling is binding upon the court when the parties have failed to make the requisite arguments necessary for that determination, and the court fails to understand how the City's inaction, as opposed to an ordinance, regulation, or legal requirement, otherwise violates § 253(a). Accordingly, based on the arguments before it, the court finds that summary judgment is not warranted in favor of Crown Castle on the issue of whether the City violated § 253(a).[4]

### C. Failure to Act in a Timely Manner

Crown Castle also contends that the City has failed to act on its applications in a timely manner, in violation of 47 U.S.C. § 332(c)(7)(B)(ii). Section 332(c)(7) states that "[a] State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request." 47 U.S.C.

---

not design-related elements of right-of-way changes should be approved. ECF No. 90, Tr. 38:19–23. Counsel explained that no DRC item gets approved without mayoral approval, so that if the Small Cell Ordinance reads that DRC approval is required, it is implied that mayoral approval is also required. Tr. 38:23–39:1. Nevertheless, the court need not resolve this issue because the propriety of the Mayor's involvement does not bear on the question of whether any City law, regulation, or legal requirement is prohibiting Crown Castle's ability to deploy telecommunications services.

[4] Crown Castle also argues that the City's actions are not "saved" by the Savings Clause in the FCA, § 253(c), and that Crown Castle provides telecommunications services. These arguments anticipate that the City will put these matters at issue; however, the City does not. Therefore, the court need not address them.

§ 332(c)(7)(B)(ii).  The FCC has adopted a regulation providing that when an authority fails to act on a sitting application on or before the "shot clock" date of an application, the authority is presumed to not have acted within a reasonable period of time.  47 C.F.R. § 1.6003(a).  The shot clock period is calculated by adding the number of days of the presumptively reasonable time period, as provided later in the regulation, and the number of days of the tolling period, if applicable.  Id. § 1.6003(b).  Relevant here, the number of days of a presumptively reasonable time period to act on an application to install a Small Wireless Facility using an existing structure, in this case, a pole, is 60 days.  Id. § 1.6003(c)(1)(i).  When the application seeks to install a Small Wireless Facility using a new structure, the period is 90 days.  Id. § 1.6003(c)(1)(iii).  Neither party here argues that any tolling period is applicable.

Crown Castle submitted the applications at issue here to use existing utility poles on April 15, 2019, April 22, 2019, May 6, 2019, and May 7, 2019.  The City has not accepted or rejected these eleven applications, and the shot clock of 60 days has clearly run.  Crown Castle also submitted applications at issue here to use new poles on April 26, 2019, May 7, 2019, and May 8, 2019.  The City has not accepted or rejected these five applications, and the shot clock of 90 days has also clearly run.

The City does not dispute that the shot clock has run on these applications.  It explains that it "has been up front and admitted that it has taken time for the DRC to work out the proper parameters for considering the applications under the process set forth in the Small Cell Ordinance."  ECF No. 79 at 18.  Instead, the City argues that the injunctive relief requested by Crown Castle, that the court grant all of Crown Castle's applications and issue necessary permits to allow Crown Castle to construct fiber optic

lines, 32 Nodes, and associated equipment in the right of way, is too drastic. Crown Castle explains that the FCC's Declaratory Ruling provides grounds for injunction relief but by no means requires mandatory injunctive relief.

Given the parties' agreement on the issue, the court finds that there is no genuine issue of material fact as to whether the City has violated 47 U.S.C. § 332(c)(7)(B)(ii) and grants summary judgment in favor of Crown Castle on this issue, specifically as to Counts III and IV of Crown Castle's second amended complaint. The court now must consider the proper remedy for this violation.

"The TCA does not specify a remedy for violations of the cellular siting subsection." Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 497 (2d Cir. 1999). When the FCC received comments on 47 C.F.R. § 1.6003, several commenters advocated for the FCC to "adopt a deemed granted remedy." In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. at 9153. The FCC declined to do so, explaining that it is "confident that the rules and interpretations adopted here will provide substantial relief, effectively avert unnecessary litigation, allow for expeditious resolution of siting applications, and strike the appropriate balance between relevant policy considerations and statutory objectives guiding [its] analysis." Id. at 9153–54.

Therefore, the court has full discretion in determining what proper injunctive relief is warranted for a violation of the shot clock. Crown Castle seeks an injunction ordering the City to accept Crown Castle's applications. Crown Castle argues that it will suffer irreparable harm if the City's delay continues and that there is no other remedy available. The City argues that this type of injunctive relief is too drastic, citing Up State

Tower Co., LLC v. Town of Kiantone, New York, 718 F. App'x 29 (2d Cir. 2017).  In Up State Tower Co., the court found that the district court did not abuse its discretion in denying affirmative injunctive relief to Up State because the Town of Kiantone only violated the shot clock in § 332(c)(7)(B)(ii), and courts generally grant injunctive relief when a local government both violates the shot clock and another subsection of § 332(c)(7)(B).  718 F. App'x at 32 (collecting cases).  Instead, the Second Circuit approved of the district court's order that the town act on Up State's applications within 20 days.  Id. at 31.  Here, Crown Castle contends that the City violated more than just the shot clock; it also contends that the City violated § 253(a).  However, as discussed above, the court declines to grant summary judgment in favor of Crown Castle to find that the City has violated § 253(a).  As such, the court is only faced with a shot clock violation, which Up State Tower Co. suggests is alone insufficient to warrant the injunctive relief that Crown Castle requests.

Crown Castle argues the Declaratory Ruling "rejected and corrected" the decision in Up State Tower Co.  ECF No. 82 at 18.  The Declaratory Ruling states that "[a]lthough some courts, in deciding whether an injunction is the appropriate form of relief, have considered whether a siting authority's delay resulted from bad faith or involved other abusive conduct," citing Up State Tower Co., the FCC continues, stating that "we do not read the trend in court precedent overall to treat such considerations as more than relevant (as opposed to indispensable) to an injunction."  In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv., 33 F.C.C. Rcd. at 9149–50.  However, the FCC eventually advocates for a balancing approach, explaining that

We therefore caution those involved in potential future disputes in this area against placing too much weight on the Commission's recognition that a siting authority's failure to act within the associated timeline might not always result in a preliminary or permanent injunction under the Section 332(c)(7)(B) framework while placing too little weight on the Commission's recognition that policies established by federal communications laws are advanced by streamlining the process for deploying wireless facilities.

Id. at 9150. The FCC then explains that it "anticipate[s] that the traditional requirements of awarding preliminary or permanent injunctive relief would likely be satisfied in most cases and in most jurisdictions where a violation of is found." Id. The FCC reviews the factors courts consider in granting injunctive relief, like actual success on the merits, and concludes that "[t]he framework reflected in this Order will provide the courts with substantive guiding principles in adjudicating Section 332(c)(7)(B)(v) cases, but it will not dictate the result or the remedy appropriate for any particular case; the determination of those issues will remain within the courts' domain." Id. at 9150–51.

First, as discussed above, while the Declaratory Ruling does seem to disagree with the holding of Up State Tower Co., the parties have not presented sufficient argument on whether the FCC Declaratory Ruling is binding on the court. In other words, it is unclear whether or not the court must accept the FCC Declaratory Ruling's rejection of Up State Tower Co.

Next, the court has only found one case in which a court granted injunctive relief solely for the violation of § 332(c)(7)(B)(ii), Masterpage Commc'ns, Inc. v. Town of Olive, N.Y., 418 F. Supp. 2d 66 (N.D.N.Y. 2005). In Masterpage Commc'ns, the court found injunctive relief to be warranted because the town "relinquished its right to seek further review of Masterpage's application" because the town disregarded "clearly established New York law" as well as its own law. 418 F. Supp. 2d at 81. Moreover, the

court noted that while the town had not yet addressed environmental impacts, the town had two years to address the issue but had failed to take the first step in doing so. As such, the court ordered the town to grant Masterpage's application.

The facts here are different. First, the court is not convinced that the City has disregarded any law because there was no ordinance in place governing this process, and Crown Castle has not pointed to any South Carolina law that the City has allegedly violated. Moreover, the City is in the process of addressing Crown Castle's applications, as opposed to the town in Masterpage Commc'ns's complete failure to do so. The City has presented evidence that while it certainly has been dragging its feet, some progress has been made. Therefore, the facts that convinced the Masterpage Commc'ns court to grant injunctive relief are not present here.

In support of its argument that an injunction is appropriate here, Crown Castle cites to several cases for the proposition that remanding the case to the City is pointless and would thwart § 332(c)(7); however, none of those cases dealt with a violation of § 332(c)(7)(B)(ii), which requires a local authority to act within a reasonable time. Instead, they focus on other subsections of § 332(c)(7) that contain different requirements warranting different considerations, like whether a local government's denial of a request to place personal wireless service facilities is supported by substantial evidence. T-Mobile Ne. LLC v. Loudoun Cty. Bd. of Sup'rs, 903 F. Supp. 2d 385, 413 (E.D. Va. 2012), aff'd, 748 F.3d 185 (4th Cir. 2014) (declining to remand case to local authority because there was no genuine dispute that the local authority violated § 332(c)(7)(B)(iv) and instead directing the local authority to issue the disputed permits); Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Twp., 20 F. Supp. 2d 875, 878 (E.D. Pa. 1998),

aff'd, 181 F.3d 403 (3d Cir. 1999) (declining to remand case when zoning board violated § 332(c)(7)(B)(iii) by failing to support its decision by substantial evidence and ordering board to issue zoning permits); Ogden Fire Co. No. 1 v. Upper Chichester TP., 504 F.3d 370, 396 (3d Cir. 2007) (same holding regarding building permits); Preferred Sites, LLC v. Troup Cty., 296 F.3d 1210, 1222 (11th Cir. 2002) (concluding an injunction ordering the issuance of a permit is appropriate relief for violation of § 332(c)(7)(B)(iii)). As such, the court finds that these cases are not instructive on the present issue—whether injunctive relief is warranted solely for violations of the shot clock.

Crown Castle also cites to two cases in which courts have granted injunctions when there is a shot clock violation and a violation of the "effective prohibition" clause of § 332(c)(7)(B)(i)(II). ECF No. 82 at 18 (citing Bell Atl. Mobile of Rochester L.P. v. Town of Irondequoit, N.Y., 848 F. Supp. 2d 391 (W.D.N.Y. 2012) and Upstate Cellular Network v. City of Auburn, 257 F. Supp. 3d 309, 315 (N.D.N.Y. 2017)). However, Crown Castle has not brought a claim for violation of § 332(c)(7)(B)(i)(II). See generally ECF No. 96. Instead, Crown Castle's claims are based on § 253(a) and § 332(c)(7)(B)(ii). Therefore, these cases do not convince the court that it should enter an injunction requiring the City to grant Crown Castle's pending applications. Instead, the court finds it more appropriate to order the City to render a decision on Crown Castle's applications within a specified number of days of this order, as courts face with similar situations have done. See Up State Tower Co., LLC v. Town of Kiantone, New

York, 2016 WL 7178321, at *7 (W.D.N.Y. Dec. 9, 2016), aff'd, 718 F. App'x 29 (2d Cir. 2017).

In sum, the court denies summary judgment as to Count I, alleging a violation of § 253(a), and grants summary judgment in favor of Crown Castle as to Counts III and IV, alleging violations of § 332(c)(7)(B)(ii).[5]  The City shall have 90 days to act on Crown Castle's sixteen pending applications.[6]

## IV.   CONCLUSION

For the reasons set forth above, the court grants in part and denies in part the motion.

**AND IT IS SO ORDERED.**



**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 23, 2020**
**Charleston, South Carolina**

---

[5] The court notes that Crown Castle did not move for summary judgment on Count II of its complaint, which requests attorney's fees.

[6] While the court recognizes that 90 days is a long period of time especially in light of the City's inaction on these applications, based on the current environment which directly affects the City (and probably Crown Castle as well), the court is attempting to prod the City to take action on the pending applications as soon as practicable.  In normal times, the deadline would have been 30 days.